**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* <br> H REMIDEZ, LLC <br><br>          Plaintiff, <br><br>    v. <br><br> MITSUBISHI HEAVY INDUSTRIES, <br> LTD., and MHI RJ AVIATION, INC. <br>          Defendants. | CASE NO.: <br><br><br> **COMPLAINT PURSUANT TO** <br> **FEDERAL FALSE CLAIMS ACT,** <br> **31 U.S.C. § 3729 *et seq.,*** <br><br><br> **FILED *IN CAMERA*** <br> **AND UNDER SEAL** <br> <u>**PURSUANT TO 31 U.S.C. § 3729**</u> <br><br><br> **NOT FOR PUBLIC DISCLOSURE** <br> **DO NOT PLACE IN PRESS BOX** <br> **DO NOT ENTER ON PACER** <br><br><br> **JURY TRIAL DEMANDED** |

<u>***QUI TAM* COMPLAINT**</u>

**INTRODUCTION**

1.    MHI RJ Aviation, Inc. ("MHI RJ"), a subsidiary of a Japanese manufacturing conglomerate, certified it was eligible to receive $50.6 million in emergency aid from United States taxpayers when it was not.

2.    In its application to the United States Department of the Treasury ("Treasury"), MHI RJ certified that it paid and employed staff nine months before the company finalized its purchase of the nationwide aviation maintenance and repair business it now operates.

3.      The Payroll Support Program ("PSP") required Treasury to calculate aid based on the applicant's certified payroll between April and September 2019. The $750 million purchase of the company's aviation maintenance operation was completed in June 2020. MHI RJ was not incorporated until October 2019.

4.      Congress imposed additional restrictions prohibiting corporations from rewarding their shareholders at the expense of American taxpayers. Federal law and regulations barred PSP recipients from paying dividends to stockholders and restricted executive compensation.

5.      MHI RJ certified in three financial aid applications to Treasury in 2020 and 2021 that the company and its affiliates would comply with the provisions of the PSP prohibiting rewards to stockholders before October 1, 2022.

6.      Despite the prohibition, Mitsubishi Heavy Industries ("MHI"), its corporate parent, paid shareholders more than $500 million in dividends after its American subsidiary accepted $50.6 million in emergency aid from United States taxpayers.

7.      The Japanese conglomerate issued dividends totaling $1.49 per share to more than 337 million stockholders in June 2021, December 2021, and June 2022, all in violation of the PSP.

8.      This action seeks to recover damages and civil penalties on behalf of the United States through the False Claim Act ("FCA"). The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty, as well as three times the amount of the damages sustained by the Government.

## PARTIES

9.    **Relator H Remidez, LLC** is a Texas limited liability company. Dr. Herbert Remidez, Jr. is the president, secretary and treasurer of the company. Dr. Remidez holds a Ph.D. in Information Science and Learning Technologies from the University of Missouri at Columbia. He has been employed as a faculty member in the Satish and Yasmin Gupta College of Business at the University of Dallas since 2010, where he currently serves as a tenured Associate Professor, the Director of the MS Business Analytics degree program, and the Director of the new MS Data Science and AI degree program. From 2014 through the present, Dr. Remidez has taught business analytics courses with a focus on cloud computing, big data analytics, predictive modeling, advanced business analytics and artificial intelligence. He used data analytics to identify the fraud specified herein.

10.    **Defendant Mitsubishi Heavy Industries, Ltd.** is a Japanese multinational corporation headquartered in Tokyo. In 2022, it employed 77,991 and recorded annual revenues of about $31.5 billion.  One of the world's largest industrial companies, it offers products and services in the aerospace, aviation, defense, energy, and shipbuilding industries.

11.    **Defendant MHI RJ Aviation, Inc.** provides maintenance, repair and overhaul services for the CRJ series of aircraft from strategically located service centers across the country. MHI RJ was incorporated in Delaware on October 15, 2019.

## JURISDICTION AND VENUE

12.    This action arises under the FCA. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

§ 3732(a), which authorizes nationwide service of process, because Defendants can be found in,

reside in, have transacted business in, and/or have committed the alleged acts in the District of

Delaware.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C.

§ 3732(a) because Defendants can be found in, reside in, and/or have transacted business in the

District of Delaware, and a number of Defendants' alleged acts occurred in this District.

15.     Relator knows of no other FCA complaints that have been filed against

Defendants alleging the same or similar actions. Additionally, Relator is an original source as

defined in 31 U.S.C. § 3730(e)(4)(B). The Relator made voluntary disclosures to the United

States before filing this lawsuit.

## REGULATORY FRAMEWORK

### The FCA

16.     The FCA reflects Congress' objective to "enhance the Government's ability to

recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As

relevant to this case, the FCA establishes liability for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for
> payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or
> statement material to a false or fraudulent claim;

> (G) knowingly makes, uses, or causes to be made or used, a false record or
> statement material to an obligation to pay or transmit money or property to the
> Government, or knowingly conceals or knowingly and improperly avoids or
> decreases an obligation to pay or transmit money or property to the
> Government.

31 U.S.C. § 3729(a)(1).

17.     The FCA defines "knowing" and "knowingly" to mean that a person with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this Act. *Id*.

18.     An "obligation" within the meaning of the FCA includes "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment." 42 C.F.R. § 401.305(b).

19.     In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation.

### The Payroll Support Program

20.     Congress established the Payroll Support Program to provide financial aid to passenger airlines, cargo air carriers and certain industry-related contractors as part of the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), 15 U.S.C. § 9074. The PSP required that financial assistance from taxpayers be used exclusively for the continuation of employee wages, salaries and benefits in the aviation industry.

21.     Signed into law on March 27, 2020, the $1.9 trillion CARES Act is one of the largest economic rescue programs in the country's history. The CARES Act authorized Treasury to provide "payroll support in such form, and on such terms and conditions, as determined appropriate" to the aviation industry. Congress extended the PSP program and increased funding through the Consolidated Appropriations Act of 2020, 15 U.S.C. § 9094 and §9096, and the American Rescue Plan Act of 2021, 15 U.S.C. § 9141, stimulus programs totaling $2.8 trillion.

22.     These laws allowed Treasury to accept warrants, options, preferred stock, debt securities, notes or other financial instruments from airlines, cargo carriers and contractors to protect taxpayers and "provide appropriate compensation to the Federal Government for the provision of financial assistance." 15 U.S.C. § 9077, 15 U.S.C. § 9098, 15 U.S.C. § 9141(b)(4).

23.     Between April 2020 and April 2021, the PSP program allocated $59 billion in grants and loans to passenger airlines through three separate programs. In the first phase, Treasury based individual payments to air carriers and contractors on payroll expenses incurred between April 2019 and September 2019, subject to proration. The program's second phase, PSP2, awarded the amount approved under the first phase of the program or, for first-time recipients, employee compensation paid from October 1, 2019 through March 31, 2020. The third phase, PSP3, used a formula to calculate grants, which were awarded through February 2022.

24.     To obtain financial aid under the PSP program, Treasury required recipients to complete a letter of agreement in which an authorized representative pledged to comply with the program's terms and conditions and applicable federal law.

25.     Awards from the second phase of the PSP program ("PSP2") were conditioned upon compliance with all applicable requirements of the program's first phase ("PSP1"). Recipients were required to comply with the rules governing the first two phases of the program to receive a grant from the third phase ("PSP3").

26.     Treasury based awards under the PSP1 program on payroll incurred by the applicant between April and September 30, 2019. In an April 2, 2020 Q&A for air carriers and contractors, Treasury wrote:

> Eligible applicants may receive Payroll Support under the CARES Act equal to the compensation paid by the applicant to its employees, as determined by the Secretary of

Treasury in his sole discretion, for the six-month period between April and September 2019. Such employees include full-time, part-time, temporary, and leased employees, but do not include independent contractors or corporate officers.

27.    The agreement with Treasury and subsequent guidelines published by the Department reiterate and elaborate on each provision. In its sole discretion, a breach of any of these conditions allowed Treasury to bar an applicant from further aid under the PSP, demand repayment with interest, or initiate suspension or debarment proceedings.

28.    Terms and conditions in the initial phase, PSP1, contained these restrictions:

<u>Dividends and Buybacks</u>

Through September 30, 2021, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

29.    Terms and conditions in the second phase, PSP2, contained these restrictions:

<u>Dividends and Buybacks</u>

Through March 31, 2022, or the date on which the Recipient has expended all of the Payroll Support, whichever is later, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

30.    Terms and conditions in the third phase, PSP3, contained these restrictions:

<u>Dividends and Buybacks</u>

Through September 30, 2022, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

31.    The letters of agreement from Treasury in the PSP1, PSP2 and PSP3 programs explained:

The Signatory Entity … on behalf of itself and its Affiliates (as defined herein), agrees to comply with this Agreement and applicable Federal law as a condition of receiving Payroll Support. The Signatory Entity and its undersigned authorized representatives acknowledge that a materially false, fictitious or fraudulent statement (or concealment or omission of a material fact) in connection with the

7

Agreement may result in administrative remedies as well as civil and/or criminal penalties.

32.     Treasury defined an Affiliate as:

> *Affiliate* means any Person that directly or indirectly controls, is controlled by, or is under common control with, the Recipient. For purposes of this definition, "control" of a Person shall mean having the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership or voting equity, by contract, or otherwise.

33.     Aid recipients were required to certify that they may be subject to penalties, administrative remedies or false claims if their application contained materially false, fictitious or fraudulent statements. The certification in PSP1 and PSP 2said:

> **I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution and also may subject me and the Recipient to civil penalties and/or administrative remedies for false claims or otherwise.**

| _____ | _____ |
|---|---|
| Corporate Officer of Signatory Entity | Second Authorized Representative |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

34.     The certification from recipients of PSP3 aid omitted the phrase "or in the application that it supports" but acknowledged that materially false or fraudulent statements or concealment of material facts may subject the recipient and the signatory to criminal prosecution, and civil penalties and/or administrative remedies.

35.     The CARES Act required contractors to enter into an agreement with Treasury and certify compliance with the PSP program's terms and conditions, including not paying dividends to the holders of common stock. 15 U.S.C. § 9074 (a)(3) Treasury determined the form and manner of the agreement.

36.    After recipients accepted the PSP terms and conditions, Treasury required them to file quarterly compliance reports. These reports contain mandatory sections detailing employee headcount, compensation information, the number of high-income employees and corporate officers subject to financial restrictions, supporting documentation, financial reports, tax forms detailing employee wages, plans for restructuring and certifications.

37.    In the certification section, Treasury mandated:

> … recipients certify their ongoing compliance with the terms and conditions of the PSP Agreement, maintenance of effective internal controls related to compliance with the PSP Agreement, and the veracity and accuracy of any data, documents or information provided to Treasury.

38.    Treasury warned participants that failure to provide timely and accurate information may result in the Department finding the recipient in violation of the PSP agreement. Under the agreement Treasury alone has the authority to withhold additional support, terminate the arrangement and require repayment, if it concludes a participant was non-compliant. For example, the PSP1 agreement said:

> If Treasury makes a final determination … that an instance of noncompliance has occurred, Treasury may, in its sole discretion, withhold any Additional Payroll Support Payments; require repayment of the amount of any previously disbursed Payroll Support, with appropriate interest; require additional reporting or monitoring; initiate suspension or debarment proceedings as authorized under 2 CFR Part 180; terminate the Agreement; or take any such other action as Treasury, in its sole discretion, deems appropriate.

Treasury provided the same guidance to recipients in the PSP2 and PSP3 agreements.

## RELATOR'S METHODOLOGY

39.    In 2020, Dr. Remidez, the principal of the Relator, used his knowledge of advanced analytics in conjunction with various software packages that rely on artificial intelligence to review electronic information maintained by the Small Business Administration

("SBA") detailing PPP loans made to individuals, sole proprietorships and companies across the country.

40.     Using cloud-based software, Dr. Remidez assembled a PPP-loan database of 67 separate and related tables ranging in size from 2,840 to 8.8 million rows. Database tables organize information into rows and columns, much like an Excel spreadsheet, making it easier to store and compare. His analysis began by converting each of the PPP program regulations and guidance into software rules that could be used to help examine the hundreds of billions of dollars in taxpayer-backed loans.

41.     After structuring and organizing the SBA data, Dr. Remidez augmented his PPP-loan database with information from 26 separate sources including non-profit tax information maintained by the Internal Revenue Service, data from the U.S. Treasury, the Department of Labor, the Federal Deposit Insurance Corporation and legislative lobbying records maintained by Congress as well as datasets detailing individuals and companies debarred or excluded from federal contracting, businesses registered under the Foreign Agents Registration Act, investment firms supervised by the Securities and Exchange Commission and firms that are traded on national stock exchanges.

42.     These datasets use different naming conventions and identifiers, making an electronic comparison impossible. Resolving these differences to allow an accurate comparison required exploratory analysis, data preparation and the development of customized computer code, commonly called recipes, to identify and resolve inconsistencies and anomalies. In this case, the data "cleaning" process used customized software recipes with as many as 59 steps. These cleaning steps include, for example, removing leading and trailing whitespaces, replacing missing values and converting names to uppercase. This cleaning process was applied to each of

10

these varied datasets. Many of the database inquiries used to standardize the information required hours to complete.

43.     Dr. Remidez then employed an entity resolution software program powered by artificial intelligence (AI). Entity resolution software determines whether records from diverse sources match. Record-matching programs can match names with slight misspellings, accent marks, and abbreviations. They cannot recognize relationships within the data or update results to incorporate newly added information. AI-driven programs perform rudimentary matching while incorporating additional techniques to recognize what the underlying data strings represent.

44.     The AI software used by Dr. Remidez recognizes common nicknames, common misspellings and variations on the same address. For example, the AI learning model equates Jim with James, Bill with William and Mohammed with Mohammad. It also recognizes address variations and matches them, such as 1 First St. and One 1$^{St.}$ Street. When new information is added, the AI-driven software dynamically updates. In simple terms, it "learns" with every update.

45.     An analysis of PPP loan data for November 2021 in Arizona illustrates the operation of the AI-driven software. An analysis using Microsoft Excel found 209 duplicate borrowers among 128,807 loans. After cleaning the data, it identified 253. Using only the PPP loan data maintained by SBA, the AI-driven software labeled 865 as duplicates, four as possible duplicates and 24,000 as possibly related.

46.     In this example, after adding eight additional data sets – comprising medical practices and business addresses, Economic Injury Disaster Loans, resident visa applications,

Shuttered Venue and Restaurant Revitalization loans – the duplicates increased by 63 and the possibly related category fell by 2,600.

47.    While these results are impressive, all AI systems are fallible. To mitigate errors, Dr. Remidez compared the results against additional records, such as state business registries, and employed other filters and software to verify the outcome. Dr. Remidez manually checked the results.

48.    The extensive fraud uncovered in the PPP program through the use of advanced software tools and custom programming prompted Dr. Remidez to expand his examination to other government financial aid programs. Insights gained from the fraud uncovered in the loan program led him to focus on programs with eligibility and compliance requirements that are difficult to monitor.

49.    PPP fraud clustered around program requirements that are difficult to track, reducing the likelihood that wrongdoing would be identified and perpetrators would be caught. Academic research repeatedly has concluded the perceived likelihood of getting caught is a major deterrent. Dr. Remidez reviewed the terms and conditions of other federal financial aid programs, targeting those with difficult-to-monitor eligibility or compliance requirements.

50.    The PSP program's terms and conditions required retention of employees, restricted executive compensation and prohibited dividend distributions and stock buybacks. Reports required by the Department of Treasury clearly identified the number of employees but made it difficult to track executive compensation, stock purchases and dividends to shareholders.

51.    Dr. Remidez expanded his databases with information from Treasury detailing aid to passenger airlines, cargo carriers and certain contractors to the airline industry. Treasury

records listed the recipients and the amount of federal grants and loans but provided little insight into related corporations, the number of employees, executive pay or stock purchases.

52.     Data from the Department of Transportation, the Securities and Exchange Commission (SEC) and USAspending.gov, which maintains spending records on other pandemic aid programs, augmented his databases. DOT records, for example, track the number of airline employees on a monthly basis.

53.     USAspending.gov provided names, addresses, amounts received and parent company information. Once incorporated, the AI software detected relationships in the PSP program and the PPP loan program. The program detected declared and undeclared relationships between companies.

54.     After identifying the relationships, Dr. Remidez developed a custom software program to extract information from the Electronic Data Gathering, Analysis and Retrieval system (EDGAR) database maintained by the SEC.

55.     Dr. Remidez then verified the findings of his electronic investigation by examining public filings.

56.     The expanded data warehouse constructed by Dr. Remidez allowed him to apply the program rules governing the PSP program, identify recipients and compare the results to information filed with the SEC.

57.     Although Relator H Remidez LLC used publicly available information, it is the original source of the allegations and the proprietary analysis, methodology and data synthesis detailed herein.

## ALLEGATIONS

58.     Congress enacted the Payroll Support Program to avert mass layoffs in the aviation industry amid unprecedented drops in airline travel and dramatic financial losses that threatened to shutter aviation-related contractors.

59.     Tokyo-based MHI is a global industrial group with 257 subsidiaries that provide services in the aerospace, aviation, defense, energy, plants and infrastructure and logistics, thermal, and drive systems sectors. It has 191 offices worldwide. In 2020, it generated $37.1 billion in revenue, producing a profit of $985.8 million and employed 81,631. It is publicly traded on the Tokyo Stock Exchange.

60.     Based in Bridgeport, West Virginia, Defendant MHI RJ provides operational, engineering and customer support for the global regional aircraft industry. Its services include maintenance, refurbishment, marketing and sales.

61.     Defendant MHI RJ received $50.6 million in PSP grants from taxpayers that did not need to be paid back. It is owned, controlled and directed by MHI through the Japanese conglomerate's wholly-owned subsidiary MHI RJ Aviation ULC, which is based in Montreal.

### Specifics of the Fraud

62.     On June 25, 2019, MHI announced its purchase of the Canadair Regional Jet ("CRJ") program from Bombardier, Inc. for about $750 million. MHI told stockholders:

> This business acquisition will help us complement our existing commercial aircraft business, particularly functions for the development, manufacture, sale and customer support for the Mitsubishi SpaceJet family. By combining the infrastructure and resources that the Group possesses in Japan, Canada, and around the world, this business acquisition will be an effective means for ensuring the future success of the Mitsubishi SpaceJet family.
>
> We also believe this acquisition is an important step within the Group's growth strategy to establish a robust global commercial aircraft business.

14

63.     In October 2019, MHI created a United States subsidiary, MHI RJ Aviation, Inc. Some eight months later, in June 2020, MHI finalized its acquisition of Bombardier's CRF program. In July 2020 it received a $30.2 million award from the PSP program.

64.     Treasury calculated the $30.2 million award from taxpayers' certifications provided by MHI RJ as required by the CARES Act:

### SEC. 4113 PROCEDURES FOR PROVIDING PAYROLL SUPPORT

(a) AWARDABLE AMOUNTS – The Secretary shall provide financial assistance under this subtitle …

(3) to a contractor, in an amount that the contractor certifies, using sworn financial statement or other appropriate data, as the amount of wages, salaries, benefits, and other compensation that such contractor paid the employees of such contractor during the period from April 1, 2019, through September 30, 2019.

65.     Defendant MHI RJ, the grant recipient, did not exist during the six months between April and September 2019. MHI incorporated the aviation company in Delaware on October 15, 2019, although the Japanese conglomerate did not complete the acquisition for eight months.

66.     Defendant MHI did not own the aircraft business it now operates, for which it received emergency financial aid from American taxpayers, until June 1, 2020, about eight months after the time period used to determine the amount of the PSP award.

67.     In a news release, Bombardier confirmed that the CRJ deal with MHI closed on June 1, 2020, almost a year after it was announced.  MHI paid $550 million in cash, assumed $200 million in liabilities and received the net beneficial interest in a $170 million aircraft securitization program. Bombardier wrote:

Bombardier will continue to supply components and spare parts and will assemble the remaining 15 CRJ aircraft in the backlog as of March 31, 2020 on behalf of MHI until the complete delivery of the current backlog, expected in the second half of 2020.

68.    Federal law and regulation barred PSP applicants who don't comply with the program's conditions from receiving emergency aid. The program agreement with Treasury required an applicant's authorized representative to acknowledge:

> … a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in connection with this Agreement may result in administrative remedies as well as civil and/or criminal penalties.

69.    Recipients are also required to certify that all attachments or other information related to the application are "true and correct and do not contain any materially false, fictitious, or fraudulent statement, nor any concealment or omission of any material fact."

70.    Between July 13, 2020 and May 25, 2021, Defendant MHI RJ signed three agreements with Treasury to obtain $50.6 million in grants during the three phases of the PSP program.

71.    In the initial phase of the PSP program, Defendant MHI RJ received $30.2 million in grants that it did not need to pay back. Its July 13, 2020 agreement with Treasury said:

<u>Dividends and Buybacks</u>

> 6. Through September 30, 2021, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

72.    The PSP agreement required compliance with the terms and conditions of the CARES Act.

73.    In its 2021 annual report, Defendant MHI informed shareholders that it "made use of subsidy programs available in various countries." Rather than describe the subsidies, MHI explained its strategy to mitigate the pandemic's effects by investing in areas where the market is expected to expand, reinforcing sales networks, and shifting towards service businesses.

74. On June 30, 2021, Defendant MHI paid stockholders $228.2 million in dividends, in violation of PSP1 regulations prohibiting dividend payments to shareholders before October 1, 2021.

75. Defendant MHI recorded a $985.8 million profit in fiscal year 2020 and a $390.2 million profit in fiscal year 2021.

76. The PSP program prohibited contractors from receiving additional federal aid if they violated the initial PSP's terms and conditions. The PSP2 agreement, for example, said that payroll support shall be conditioned on and subject to compliance with all applicable requirements of PSP1.

77. Treasury elaborated on the requirement in a January 19, 2021 Q&A providing guidance:

### COMPLIANCE

1. **If a passenger air carrier or contractor has been notified by Treasury that it is non-compliant with its PSP1 agreement or a CARES Act loan agreement with Treasury, is it eligible for PSP2?**

   … Noncompliant PSP1 recipients may apply for PSP2 while the noncompliance or remedy is being reviewed or implemented. However, Treasury will not approve an applicant for PSP2 until Treasury makes a final determination regarding the remedy for any PSP1 noncompliance and the noncompliance has been remedied.

   Similarly, any PSP2 applicant that received a loan directly from Treasury under section 4003 of the CARES Act must be in compliance with the terms of its loan agreement for Treasury to approve its PSP2 application.

78. If a PSP2 applicant fails to comply with the terms and conditions of the PSP1 program, Treasury will not approve the applicant for PSP2 until it determines the noncompliance has been remediated.

79. Yet, on March 30, 2021, Defendant MHI RJ entered into a PSP2 agreement with Treasury to obtain a $10.2 million grant from American taxpayers despite failing to comply with the terms and conditions of the PSP1 financial aid program.

80.    The PSP2 agreement signed with Treasury on March 30, 2021 said:

<u>Dividends and Buybacks</u>

Through March 31, 2022, or the date on which the Recipient has expended all of the Payroll Support, whichever is later, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

81.    Nine months after the award, on December 3, 2021, Defendant MHI rewarded its 337 million stockholders with a $0.37 per share dividend, totaling $123.8 million.

82.    Treasury regulations and guidance prohibited contractors that violated the terms and conditions of PSP1 or PSP2 from receiving additional aid. The third tranche of emergency financial aid from taxpayers conditioned the award on compliance with PSP1 and PSP2. Specifically, the PSP3 agreement said:

The Secretary may determine in her sole discretion that any Payroll Support shall be conditioned on, and subject to, compliance by the Recipient with all applicable requirements under (a) PSP2 and (b) PSP1 if the Recipient received financial assistance in PSP1 and such additional terms and conditions (including the receipt of, and any terms regarding, Taxpayer Protection Instruments) to which the parties may agree in writing.

83.    Each of the letters of agreement explained:

The Signatory Entity … agrees to comply with this Agreement and applicable Federal law as a condition of receiving Payroll Support. The Signatory Entity and its undersigned authorized representatives acknowledge that a materially false, fictitious or fraudulent statement (or concealment or omission of a material fact) in connection with the Agreement may result in administrative remedies as well as civil and/or criminal penalties.

84.    In the third phase of the PSP program, Defendant MHI RJ received a $10.2 million grant from American taxpayers. MHI RJ entered into the PSP3 agreement with Treasury on May 25, 2021, two months after signing the PSP2 agreement. The award said:

<u>Dividends and Buybacks</u>

> 6. Through September 30, 2022, the Recipient shall not pay dividends, or make any other capital distributions, with respect to the common stock (or equivalent equity interest) of the Recipient.

85.     On June 30, 2022, Defendant MHI paid its shareholders $151.4 million in dividends, in violation of federal law and regulations governing the PSP program. MHI generated a $1 billion profit in fiscal year 2022.

## DAMAGES

86.     Defendant MHI RJ signed three agreements with Treasury between July 13, 2020 and May 25, 2021 certifying that the company and its affiliates would comply with the terms, conditions and restrictions imposed by the PSP program.

87.     Defendant MHI RJ certified in agreements with Treasury that it paid and employed staff six months before the company was incorporated to operate in the United States.

88.     Contrary to its certifications, neither MHI RJ nor its corporate parent, Japanese conglomerate MHI, owned the nationwide aviation maintenance business or employed its staff during the six months of 2019 used to determine the amount of the initial $30.2 million grant from American taxpayers.

89.     These false certifications disqualified Defendant MHI RJ from obtaining another $20.4 million from the second and third phases of the PSP program.

90.     These agreements required compliance with the CARES Act, Section A of Title IV of Division N of the Consolidated Appropriations Act of 2021 and Section 7301 of the American Rescue Plan Act of 2021, including provisions that recipients not pay dividends on common stock or make any capital distributions.

19

91.    Eleven months after Defendant MHI RJ accepted the PSP1 restrictions to obtain $30.2 million in grants, its corporate parent, Defendant MHI, paid a dividend of 67 cents per share to 337 million shareholders, violating federal law and regulations.

92.    In March 2021, Defendant MHI RJ falsely certified that it complied with the PSP1 And the CARES Act to obtain $10.2 million from the PSP2 program. Nine months later, on December 3, 2021, it paid shareholders a 37-cent per share dividend totaling $123.8 million, violating federal law and regulations.

93.    Two months later, in May 2021, it falsely certified compliance with the PSP2 program to obtain $10.2 million more taxpayer aid from the PSP3, the third phase of the aid program. On June 30, 2022, Defendant MHI paid stockholders a 45-cent per share dividend totaling $151.4 million, violating federal law and regulations.

94.    From June 30, 2021, through June 30, 2022, Tokyo-based Defendant MHI paid $503.4 million in dividends, despite federal law and regulations prohibiting such payments.

95.    The false and fraudulent statements in applications, agreements and compliance reports enabled Defendant MHI RJ to obtain and retain $50.6 million in grants from American taxpayers to which it was not entitled.

96.    Defendants are liable to the United States for $50.6 million obtained through false and fraudulent certifications and statements.

## COUNT I

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729 *et seq*.

97.    Relator re-alleges and incorporates by reference every allegation contained in the paragraphs above as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

98.    As described in greater detail above, Defendants employed false and fraudulent statements to obtain PSP emergency financial aid they were not eligible for or entitled to.

99.    Under the FCA, Defendants have violated:

i.    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and

ii.    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

100.    Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a.    This Court enter an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b.    This Court enter an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c.    This Court enter an order requiring Defendants to cease and desist from violating the FCA;

d.    This Court enter an order requiring Defendants to pay all expenses, attorneys' fees and costs associated with this action;

e.    This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

     f.     This Court grant any and all other relief as this Court determines to be reasonable and just.

## PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

Respectfully submitted,

CONNOLLY GALLAGHER LLP

Of Counsel:
(*pro hac vice* application forthcoming):

Dave Scher
Hoyer Law Group, PLLC
1300 I St., Suite 400E
Washington, D.C.  20004
Tel.: (202) 997-8227
dave@hoyerlawgroup.com

*Lead Counsel for Relator*

Dated:  June 18, 2024

/s/ Timothy M. Holly
Timothy M. Holly (Del. Bar No. 4106)
1201 North Market Street, 20th Floor
Wilmington, DE 19801
Tel: (302) 252-4217
Fax: (302) 757-7272
tholly@connollygallagher.com

*Delaware Counsel for Relator*